UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                         CASE NUMBER: 10-20542
v.                                  HONORABLE VICTORIA A. ROBERTS

D-1   MINDAUGAS VIRBICKAS,

               Defendant.
_____/

## ORDER DENYING MOTION TO DISMISS INDICTMENT

**I.     INTRODUCTION**

Before the Court is Lithuanian citizen Mindaugas Virbickas' ("Defendant")
Amended Motion to Dismiss the Superseding Indictment.  It charges him with: (1)
Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; (2) two counts of
Wire Fraud, in violation of 18 U.S.C. § 1343; and (3) Conspiracy to Launder Money, in
violation of 18 U.S.C. § 1956(h).

When indicted, Defendant resided in Lithuania.  To obtain his presence in the
United States, the U.S. government formally extradited Defendant from Poland – after
he voluntarily crossed into Poland – pursuant to the Extradition Treaty between the
United States and Poland (the "Polish Treaty").

Defendant argues he was entitled to a hearing under the Extradition Treaty
between the United States and Lithuania (the "Lithuanian Treaty").  He says that the
United States' failure to extradite him from Lithuania violated his due process rights and
the terms of the Lithuanian Treaty, warranting dismissal of the indictment.

The Court **DENIES** Defendant's Motion.

## II.    BACKGROUND

According to the Superseding Indictment, Defendant engaged in a conspiracy from January 2009 to January 2010 that involved the fraudulent withdrawal of funds from brokerage firms in the United States and the transfer of them to accounts in Lithuania.  Defendant, a Lithuanian citizen living in Lithuania at the time, allegedly: (1) opened Lithuanian accounts for the receipt of the fraudulently transferred funds; (2) received wire transfers of the funds from co-conspirators via Western Union and Moneygram; and (3) made cash withdrawals of the transferred funds from his bank in Lithuania.  Both the Lithuanian government and the Federal Bureau of Investigation ("FBI") investigated the fraudulent transfers.

On January 14, 2010, Lithuanian police detained Defendant in his bank after he attempted to withdraw $50,000 that had been fraudulently transferred from a U.S. account.  After questioning him, the Lithuanian authorities charged Defendant with money laundering under Lithuanian law and detained him for a short period.  In March 2010, an Assistant United States Attorney and two FBI agents met with Lithuanian prosecutors, who, upon request, discontinued the Lithuanian prosecution of Defendant. Defendant remained in Lithuania and, shortly thereafter, obtained a job as a truck driver.

With the assistance of Lithuanian authorities, the United States continued its investigation.  The indictment against Defendant first issued on September 9, 2010; on March 23, 2011, the government filed a Superseding Indictment.

Although Defendant remained in Lithuania, the United States did not seek his extradition from Lithuania, because, according to the United States, the Lithuanian Supreme Court interprets the Lithuanian Treaty to not apply to crimes committed in

2

Lithuania.  Instead, the U.S. requested the issuance of a "red notice" through Interpol. A red notice is an international notice that a country seeks the location and arrest of an individual.  If a country which received a red notice encounters the named individual, it can detain that person and notify the requesting country, which can then request extradition.

In September 2012, Defendant crossed the border between Lithuania and Poland to make a truck delivery.  When Defendant attempted to go through border control, however, Polish authorities detained him pursuant to the red notice.  After the Polish government informed the United States that it had Defendant in custody, the United States made a formal extradition request under the Polish Treaty.  *See Extradition Treaty Between the United States of America and the Republic of Poland*, July 10, 1996, S. Treaty Doc. No. 105-13, 1996 WL 905554 (July 9 1997).

Poland conducted Defendant's formal extradition hearing in the Suwalki District Court, and on November 14, 2012, that court found him to be extraditable to the United States.  *See Government's Response in Opposition to Defendant's Motion to Dismiss Indictment*, Doc. # 107, Exhibit B.  On January 31, 2013, the Polish Minister of Justice granted extradition of Defendant on all counts of the Superseding Indictment.  *Id.*  On March 3, 2013, United States Deputy Marshals traveled to Poland and escorted Defendant to the United States.

The matter is fully briefed.  Pursuant to L.R. 7.1(e)(2), the Court waives oral argument.

## III.    ANALYSIS

Defendant contends the United States' method to obtain his custody violated the

3

terms of the Lithuanian Treaty and his due process rights.  As a remedy, Defendant argues, the Court should dismiss the indictment and order his return to Lithuania, where the United States can request his extradition pursuant to the Lithuanian Treaty. Defendant also argues the Court should use its supervisory power to dismiss the indictment.  Defendant's arguments fail.

As a general principle under the *Ker-Frisbie* Doctrine, "the manner by which a defendant is brought to trial does not affect the government's ability to try him."  *United States v. Matta-Ballesteros*, 71 F.3d 754, 762 (9th Cir. 1995) (citing *Frisbie v. Collins*, 342 U.S. 519, 522 (1952); *Ker v. Illinois*, 119 U.S. 436, 444 (1886)).  While courts have recognized exceptions to the *Ker-Frisbie* doctrine "if either: (1) the transfer of the defendant violated the applicable extradition treaty, or (2) the United States government engaged in misconduct of the most shocking and outrageous kind to obtain his presence," *United States v. Struckman*, 611 F.3d 560, 571 (9th Cir. 2010), neither exception applies.

### A.   Exception One: Violation of the Applicable Extradition Treaty

#### 1.  The Applicable Extradition Treaty

Defendant states that "he had no extradition hearing anywhere," and that the Lithuanian Treaty applies in this action.  Neither statement is true.  Defendant did have an extradition hearing; the United States extradited Defendant under the Polish Treaty after a formal hearing and review by the Polish Minister of Justice.  As a result, the Polish Treaty, and not the Lithuanian Treaty, is the applicable treaty.

Although Defendant was not extradited from Lithuania, his extradition to the United States' could still violate the Lithuanian Treaty if, for example, the terms of the

4

Lithuanian Treaty: (1) provided that extradition from Lithuania was the sole method by which the U.S. could obtain custody of a Lithuanian citizen for purposes of prosecution, or (2) required the United States to comply with its terms when extraditing a Lithuanian citizen from a third country.  *See Struckman*, 611 F.3d at 572 (citing *United States v. Alvarez-Machain*, 504 U.S. 655, 662 (1992)).

### 2.  Violation of the Lithuanian Treaty

""An extradition treaty often is not the exclusive method by which the United States can obtain custody of a foreign citizen...For extradition to be the sole method of transfer, the treaty must expressly prohibit any other method."  *United States v. Gardiner*, 279 Fed. Appx. 848, 850 (11th Cir. 2008) (citing *Alvarez-Machain*, 504 U.S. at 666-70 (holding that forcible abduction of a Mexican national from Mexico did not violate the U.S.-Mexican extradition treaty because the treaty did not exclude other means of obtaining custody of individuals)).  Because nothing in the Lithuanian Treaty provides that extradition from Lithuania is the exclusive method by which the United States can obtain custody of a Lithuanian citizen for purposes of prosecution, *see Extradition Treaty Between the United States of America and the Republic of Lithuania*, Oct. 23, 2001, U.S.-Lithuania, S. Treaty Doc. No. 107-4, Art. 22 (Mar. 31, 2003), the United States did not violate the Lithuanian Treaty solely by extraditing Defendant under the Polish treaty.

Furthermore, Defendant cites no authority that would require the United States to follow the Lithuanian Treaty when it extradites a Lithuanian citizen from Poland, and absent an express provision stating otherwise, a treaty's procedures do not govern unless that treaty is invoked.  *See Gardiner*, 279 Fed. Appx. at 850 (citing *Alvarez-*

5

*Machain*, 504 U.S. at 664-65).

Accordingly, the Court finds the Lithuanian Treaty does not apply, and the United States did not violate the Lithuanian Treaty by obtaining Defendant's custody under the Polish Treaty.

### B.   Exception Two: Violation of Defendant's Due Process Rights

Defendant relies almost exclusively on his alleged rights under the Lithuanian Treaty to support his argument that the United States engaged in misconduct of the most shocking and outrageous kind in violation of his due process rights. However, as noted above, the Lithuanian Treaty does not apply.

Defendant's only argument that the government's conduct was outrageous independent of his alleged rights under the Lithuanian Treaty concerns the reason he traveled to Poland. In his Reply Brief, Defendant alleges – without producing any supporting documents – that, "[a]ccording to a local Lithuanian Newspaper account, [Defendant] was set up, or lured to Poland by a 'false delivery' order involving the truck driving delivery job" and "the employer may have been influenced by the US Government." The United States asserts that it was in no way involved in Defendant's decision to travel to Poland.

Notwithstanding whether or not the United States influenced Defendant's employer to assign Defendant a Polish delivery job, such conduct does not come close to the type of governmental misconduct required to show a due process violation. *See*, *e.g.*, *Alvarez-Machain*, 504 U.S. at 670 (reversing dismissal of indictment where U.S. DEA agents were responsible for the forcible kidnap of a Mexican citizen from his home and his transfer to Texas to be prosecuted); *United States v. Pelaez*, 930 F.2d 520,

6

525-26 (6th Cir. 1991) (holding that defendant was not entitled to be returned to Columbia due to the alleged forcible abduction to the United States, because "forcible abduction in itself does not offend due process or require dismissal of an indictment," and defendant failed to "allege[], much less demonstrate[], that his extradition was accomplished through torture, brutality or physical force") (citing *Ker*, 119 U.S. at 444).

The United States' conduct in obtaining custody of Defendant is far from outrageous and shocking based on well-established precedent.  Similar to *Pelaez*, Defendant failed to allege, much less demonstrate, that his extradition was accomplished through torture, brutality or physical force.  *See Pelaez*, 930 F.2d at 525-26.  In fact, the United States complied with formal procedures, and Defendant received adequate procedural safeguards.  First, the government requested the issuance of, and had issued, a red notice through Interpol.  This process is permitted.  *See Gardiner*, 279 Fed. Appx. 848.  Then, after Poland notified the United States that it had detained Defendant, the United States formally requested Poland to extradite Defendant under the Polish Treaty.  Finally, the United States waited until after the Polish Court held the extradition hearing and the Polish Minister of Justice granted the United States' extradition request before bringing Defendant to the United States.

Accordingly, the United States did not engage in misconduct of the most outrageous and shocking kind in obtaining custody of Defendant, and did not violate Defendant's due process rights.

### C.    The Court's Supervisory Power

Defendant raises for the first time in his Reply Brief that the Court should use its supervisory power to dismiss the indictment.  By failing to raise this in his initial motion,

7

Defendant waived this argument.  However, even on the merits, Defendant fails to allege facts sufficient for the Court to dismiss the indictment using its supervisory power.

In extraditing Defendant from Poland, the United States did not violate any statutory or constitutional right or violate customary international law, and there is no need to preserve judicial integrity or deter future illegal government conduct.  *See Struckman*, 611 F.3d at 574-75 (listing the reasons a court can dismiss an indictment under its supervisory power).   In addition, Defendant fails to demonstrate prejudice, which he is required to do before the Court can dismiss the indictment under its supervisory power.  *Id.*

Accordingly, the United States' conduct in obtaining custody of Defendant does not warrant dismissing the indictment under the Court's supervisory power.

## IV.   CONCLUSION

Defendant's Motion to Dismiss the Indictment is **DENIED**.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  September 18, 2013

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on September 18, 2013.

S/Linda Vertriest
Deputy Clerk

8

9